**IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MISSOURI WESTERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) **Case No. 26-00291-01-CR-W-FJG** |
| | ) |
| **Plaintiff,** | ) **Kansas City, Missouri** |
| | ) **June 8, 2026** |
| **v.** | ) |
| | ) |
| **LAKE ETHAN ROBERTS,** | ) |
| | ) |
| **Defendant.** | ) |
| | ) |

**TRANSCRIPT OF PRELIMINARY AND DETENTION HEARING BEFORE THE HONORABLE LAJUANA M. COUNTS UNITED STATES MAGISTRATE JUDGE**

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | Mr. William A. Alford, III<br>Mr. K. Brandon Chlarson<br>Assistant United States Attorneys<br>400 E. Ninth St., Ste. 5510<br>Kansas City, MO 64106<br>(816) 426-3122 |
| For the Defendant: | Ms. Lisa G. Nouri<br>2526 Holmes<br>Kansas City, MO 64108<br>(816) 547-5625 |
| Court Audio Operator: | Ms. Traci Chorny |
| Transcribed by: | Rapid Transcript<br>Lissa C. Whittaker<br>1001 West 65th Street<br>Kansas City, MO 64113<br>(816) 914-3613 |

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

(Court in Session at 1:41 p.m.)

THE COURT: All right. We are here on Case No. 26-mj-00078-JAM-SWH, *United States of America vs. Lake Ethan Roberts*. May I please have entry of appearance for the Government?

MR. ALFORD: Good afternoon, Your Honor. Trey Alford and Brandon Chlarson on behalf of the United States.

THE COURT: All right. Thank you. And for Mr. Roberts?

MS. NOURI: Good afternoon, Your Honor. Lisa Nouri appearing with Mr. Roberts.

THE COURT: All right. Thank you. All right. So, we are here for the preliminary and detention hearing, Mr. Roberts. In this proceeding I'll advise you of the charges against you and your constitutional rights, and then we'll get to the heart of the preliminary hearing. Let me go ahead and remind you of your constitutional rights. You have the right to an attorney. You have the right to be represented by an attorney at all proceedings, both in and out of court. You have the right to have an attorney present during any questioning by authorities. You also have the right to hire an attorney that choose. But if you can't afford one, the court will appoint one for you at no cost, and Ms. Nouri is here as your court-appointed attorney. Are you --

MS. NOURI: I'm retained, Your Honor.

THE COURT: You're retained? Okay. I'm sorry.

MS. NOURI: That's okay.

THE COURT: Okay. As retained attorney. So, do you understand your right to an attorney?

MR. ROBERTS: Yes, Your Honor.

THE COURT: Okay. You also have the constitutional right to remain silent. So, if you've made any statements, you don't have to make any further statements. If you start to make a statement while we are here in court today and you want to stop, then you can stop. If you decide to make a statement, as I said, you have the right to talk with your attorney and have that attorney present during any questioning. If you do decide to make a statement, you need to understand that that statement could be used against you. Do you understand your right to remain silent?

MR. ROBERTS: Yes, Your Honor.

THE COURT: All right. So, the Complaint that was filed here in the Western District of Missouri charges you with unlawful possession of unregistered firearms or destructive devices. I'm going to have the Government to read or summarize that Complaint and he's also going to tell you what the penalties are for the charges.

MR. ALFORD: Your Honor, this is a one-count Complaint that alleges that on or about May 14, 2026, here in the Western District of Missouri, that the defendant, Lake Ethan Roberts, knowingly possessed two firearms, that is, two destructive devices, to wit: two items that Mr. Roberts referred to as,

quote, "alcohol shooters filled with black powder surrounded with steel BBs," end quote, that constitute two improvised explosive devices (IEDs), also called homemade bombs, generally consisting of explosive main charges, methods of initiation, and containers and enhancements, specifically, bottles surrounded by BBs that were adhered to the bottles with duct tape, as defined by Title 26 of the United States Code, Section 5845(a)(8) and (f), that were not registered to him in the National Firearms and Registration Transfer Record, all in violation of Title 26, United States Code, Sections 5861(a) and 5871.

The maximum penalty for this offense is not more than ten (10) years of imprisonment, not more than a $10,000 fine, not more than three (3) years of supervised release. This is a Class C felony, and, if convicted, it carries a mandatory $100 special assessment.

THE COURT: All right. Thank you. Mr. Roberts, do you understand the charges that you face?

MR. ROBERTS: Yes, Your Honor.

THE COURT: And do you also understand the penalties that go with those charges?

MR. ROBERTS: Yes, Your Honor.

THE COURT: Okay. Now, since you were charged by way of a Complaint, you have the right to this preliminary hearing. And of course at this hearing, the Government would have the burden of proof of showing that there's probable cause to believe that a

crime has been committed and that you were the person that committed that crime. So, we're going to go ahead and get started on that right now. Are there any stipulations regarding the preliminary hearing?

MR. ALFORD: For regards to the preliminary hearing, it's my understanding that both parties are willing to agree, if called to testify, that Special Agent Melissa McLain would testify consistent with the affidavit in support of the Complaint.

MS. NOURI: That's correct, Your Honor.

THE COURT: All right. So, the affidavit attached to the Complaint will be part of the record as stipulated to by the parties. Any other stipulations?

MR. ALFORD: No evidence related to the preliminary hearing portion of this hearing.

THE COURT: Okay. Ms. Nouri, anything from you?

MS. NOURI: No, Your Honor.

THE COURT: All right. You want to have argument on that?

MR. ALFORD: No, Your Honor.

THE COURT: Okay. Anything? Oh, all right. All right. So, the Court had read through the Complaint and affidavit before taking the bench here today. And based upon that information, the Court does find that there's probable cause to believe that the crimes as listed in the Complaint and affidavit were

committed by this defendant, Lake Ethan Roberts.

So, next, the next issue we need to deal with, Mr. Roberts, is the detention hearing. And that's because the Government has filed a motion to have you detained in custody while these charges are pending here. So, I need to decide whether a bond should be set for you or whether you will be in custody. So, we're going to get started on that right now.

First of all, the Court has received a copy of the Pretrial Services Report dated June the 4th of 2026. It was authored by Tanis Humig with the Pretrial Services Office, and she is here and available for any questioning. I'll ask the Government first, Mr. Alford, did you receive a copy of that Pretrial Report?

MR. ALFORD: I did, Your Honor.

THE COURT: Do you have any changes or corrections to that report?

MR. ALFORD: I do not.

THE COURT: Okay. Would you stipulate that if called, that Ms. Humig would testify consistent with that report?

MR. ALFORD: Yes, Your Honor.

THE COURT: All right. Thank you. Ms. Nouri, for the defense, did you also receive a copy of that Pretrial Report?

MS. NOURI: We did, Your Honor.

THE COURT: Did you have a chance to go over that with Mr. Roberts?

MS. NOURI: I did, Your Honor. We would stipulate that I have some supplemental proffer regarding the report.

THE COURT: A proffer toward corrections or just a proffer?

MS. NOURI: Just additional, more specific information.

THE COURT: Let's go and do that now. Any specific information?

MS. NOURI: The three prescribed medications are for PTSD/depression, mood stabilizer, and depression. Those are prescribed by his general practitioner. There is an established relationship with a therapist who has been contacted and would restart therapy immediately. And I also would like to proffer that there's no guns in the parents' home.

THE COURT: Okay. That's kind of really in reference to the first paragraph under his history and residence and family ties. Okay. So, no guns in home. Okay. All right. So, with those additions, I gather you already said that you would stipulate that if called, that Ms. Humig would testify consistent with that report?

MS. NOURI: Correct, Your Honor.

THE COURT: All right. Thank you. All right. This report is part of the record. Anything else from the Government, Mr. Alford?

MR. ALFORD: Yes, Your Honor. First, the United States would request the Court to consider the stipulation of Special

Agent McLain's affidavit that we already had for purposes of the preliminary hearing, is also to consider that as part of the detention hearing.

THE COURT: Would you agree to that, Ms. Nouri?

MS. NOURI: Yes, Your Honor.

THE COURT: All right. So, the affidavit is part of this portion of this proceeding.

MR. ALFORD: And then in addition to that, Your Honor, the United States has some testimony it would like to elicit from Special Agent McLain.

THE COURT: Okay. All right. Agent, if you want to come up and be sworn in and then take a seat.

MELISSA McLAIN, GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. ALFORD:

Q. Would you please state your name and spell it for the record?

A. It's Melissa McLain. M-E-L-I-S-S-A, M-C-L-A-I-N.

Q. Where do you currently work?

A. I work for FBI in Kansas City.

Q. And what do you do with the FBI?

A. I'm a special agent. I've been there for about six years.

Q. Could you briefly summarize your law enforcement background for the Court?

A. So, I originally worked for the FBI in Oklahoma City, and then I've been an agent for over six years where I work primarily

domestic terrorism, so that mostly involves working to prevent crimes of violence. Online threats are part of that.
Q. Are you familiar with an individual named Lake Ethan Roberts?
A. Yes.
Q. And how are you familiar with Mr. Roberts?
A. He was the subject of one of our investigations.
Q. Okay. And what was that investigation? What did it entail?
A. That investigation began over concerns that there were violent plans towards law enforcement as well as some other political groups.
Q. And how did this investigation, you know, how was it opened by the FBI?
A. We originally got information from a Kansas City, Missouri Police Department detective who was aware of these discussions and sent us screenshots. At that time we opened an investigation because they -- they dealt with a lot of plans for violence and things like that.
Q. And what were -- in what forum were these communications delivered?
A. Signal.
Q. Okay. And is that an application that you can have on your phone?
A. Yes. An application that allows for, I believe, encrypted communication.
Q. All right. And as part of your involvement in this

investigation, are you familiar with how Mr. Roberts looks?
A. Yes.
Q. Do you see him here in the courtroom today?
A. Yes. He's here in front of me to my left.
Q. Okay. And what's he wearing?
A. The orange jumpsuit.
MR. ALFORD: Okay. Your Honor, may the record reflect the witness has identified the defendant?
THE COURT: Yes. The record will reflect that Mr. Roberts has been identified.
BY MR. ALFORD:
Q. Now, Agent McLain, with respect to your involvement in this investigation, were you ever involved in the execution of an arrest warrant for the defendant?
A. Yes. We had an arrest warrant and a search warrant that was executed last Wednesday.
Q. Okay. And were you personally present during the execution of those warrants?
A. Yes, I was.
Q. And did you have any interaction with the defendant?
A. Yes.
Q. And prior to having interaction with the defendant, did you apprise him of his *Miranda* rights?
A. I did, yes.
Q. Could you just briefly summarize what Mr. Roberts told you

when you interacted with him?

A. Yes. So, I interviewed Mr. Roberts where we talked about the Red -- they're called the Red Legs group. That's the group that was primarily discussing these violent plans on Signal. So, we talked about, you know, the history of the group as well as the members. And I brought up and asked about many of the different things that were talked about in that group.

Q. Okay. And were you also present while law enforcement officials were executing the search warrant of the defendant's residence?

A. Yes.

Q. Could you summarize for the Court items of investigative significance that investigators found?

A. So, we found -- we took firearms, around four of those that were found in the bedroom, ammunition, as well as what's suspected to be controlled substances, specifically mushroom powder, was all taken from the residence.

Q. Okay. Were there any other types of controlled substances that were suspected?

A. No other controlled substances.

Q. Any plants or --

A. I apologize. There was also a THCA that was being grown in a closet.

Q. With respect to the mushrooms that were identified, did that have any additional significance to you?

A. So, the mushrooms was something that I was aware of because we had introduced an undercover officer in this investigation around fall of last year. Within this officer's interactions with Lake, the undercover officer actually purchased mushroom powder from Lake, which would have occurred in the month of May.
Q. And with respect to that purchase, was that a controlled purchase?
A. Yes.
Q. And could you just briefly summarize how the FBI conducted the controlled purchase?
A. So, the undercover went to Lake's residence where he received the mushroom powder. He was wearing a recording device and left money for Lake where when that meeting was concluded, we took that powder where it will be tested by a lab for what it contains.
Q. Okay. So, at this time you don't have any lab reports back on it?
A. I do not, no.
Q. And as part of your involvement in this investigation, have you taken any steps to recover remnants of the detonated destructive devices that were referenced in your affidavit in support of the Complaint?
A. Yes. We went out -- some of the investigative team went out to recover what was left at the site where those two devices were exploded, and they were able to recover remnants of bottles is

what they found.
Q. Are you familiar with an individual named Jarred Gilliam?
A. Yes. He's another subject of this investigation.
Q. Okay. Was Jarred Gilliam a remember of the Red Legs group?
A. Yes, he was.
Q. And did he also have communications that were in this Signal chat group?
A. Yes. He was within the Signal chat group.
Q. And is it fair to say that Jarred Gilliam is identified as Subject Number 3 in your affidavit in support of the Complaint?
A. Yes, he is.
Q. And I'd like you to take what's -- I've put in front of you, the item that's marked Government Exhibit #1. Are you familiar with that document?
A. Yes. That's my Complaint.
Q. Okay. And is the Complaint against who?
A. Jarred Gilliam.
Q. And where was that Complaint filed?
A. In the District of Kansas.
Q. And what does the Complaint charge Mr. Gilliam with?
A. Unlawful possession of an unregistered firearm, specifically, a destructive device.
Q. Okay. And that's the same charge that the defendant in this case is charged with?
A. Correct.

MR. ALFORD: Your Honor, at this time the United States moves to admit Government Exhibit #1.

THE COURT: Any --

MS. NOURI: No objection, Your Honor.

THE COURT: Okay. All right. So, Government's Exhibit #1 will be admitted without objection.

BY MR. ALFORD:

Q. Were you involved with executing an arrest warrant on Mr. Gilliam?

A. Yes. An arrest and a search warrant for Jarred Gilliam as well.

Q. Okay. And with respect to the search warrant, was that related to Mr. Gilliam's residence?

A. Yes, it was.

Q. And what state was located in?

A. Kansas.

Q. And could you describe, you know, generally what items of investigative significance were recovered at Mr. Gilliam's residence?

A. So, from the residence we found what's believed to be destructive devices known as Molotov Cocktails that were in an outbuilding or a shed. In that same shed there were many other chemicals that are being sent to the lab, but from my understanding are also capable of being weaponized. We took a notebook that had a lot of different notes in it. We took a bag

that had a couple of vials. The vials were not full but mostly empty or had had some remnants in there. One of those vials was a muscle relaxant, my understanding a paralytic. And then the vial was an anaesthetic agent. In that same bag with the vials was an Airtag, as well as condoms.

Q. Okay. And where does Mr. Gilliam work?

A. He works at KU Medical Center.

Q. I'd like you to now take a look at Government Exhibit #2. Are you familiar with that document?

A. Yes. That's a page from the notebook that we recovered.

Q. Okay. And so this is Mr. Gilliam's notebook?

A. Yes.

Q. And could you briefly describe to the Court what's depicted on that page?

A. So, this is a page of notes regarding World Cup. The first part of it says "World Cup Roundtable" and it has names with different abbreviations next to it, maybe different members that were part of a meeting. And then we go on to the page to find specific details about World Cup events. So, there's one section that has where games are, and the dates I know to be accurate. A second section of that has Fan Fest information. The game portion says they're going to be held at Arrowhead Stadium, and then the Fan Fest at World War I lawn, which I believe most of that to be accurate. In the bottom half of the page it says "local concerns," and it talks about different tactics from law

enforcement, so where the KCPD Command Post is going to be, their surveillance capabilities, and drones that they may be using.

Q. Okay. And with the drones there's like a quote, "Cribl com systems"?

A. Yes.

Q. And the dates, just to confirm, the dates that you looked at, those correspond to dates of World Cup matches?

A. Yes, they are.

Q. With respect to going back to the defendant's search warrant, did law enforcement officials or an official have any interaction with a neighbor of the defendant?

A. So for Lake Roberts' search?

Q. Yes.

A. There was an interaction with the owner of the connecting duplex, so he was talked to that same day, yes, sir.

Q. Okay. And what's your understanding of what the neighbor reported?

A. The neighbor brought to our attention in that interview that the same day of the controlled buy, a date that was in May that I had previously talked about where the undercover officer was over there making a purchase, he talked about seeing Lake in the back burning and then using a hose in the back part of the property is what he told us.

Q. Okay. And did he -- did he say anything else about anything that the defendant might have said?

A. Yes. He told us that Lake had spoke to him about somebody asking him to build a bomb, I believe. And Lake had said that wasn't something he wanted to participate in.

MR. ALFORD: Okay. No further questions.

THE COURT: Ms. Nouri?

MS. NOURI: Thank you, Your Honor.

CROSS-EXAMINATION

BY MS. NOURI:

Q. Good afternoon, Agent.

A. Good afternoon.

Q. I just want to clarify the search warrant that was executed at Mr. Roberts' residence, there were actually three guns, correct, recovered? I think you said three or four, and I believe it's three.

A. Okay. That might be correct. It's around -- around four is what I thought. It may be three.

Q. And if I told you it's a pistol, a shotgun, and rifle, would you agree with that?

A. Yes. Yeah.

Q. And all of those firearms are legally registered, is that correct?

A. I do not know the status of that, if they were legally registered or not.

Q. Well, if I told you that Mr. Roberts had legally registered those firearms, you would not disagree with me today?

A. No. I wouldn't disagree.
Q. And to go to the mushroom powder, I really truly am not familiar with mushroom powder. I doubt the Judge is. What exactly is mushroom powder?
A. So, to my understanding that is going to be a controlled substance is the basis of my knowledge for that. And that's what a lab test will confirm.
Q. Let's assume that's what it is though. And like, is it in a powder form?
A. It's a powder form, yes.
Q. Do you know how much was recovered?
A. I don't know the amount. We're talking grams.
Q. Okay.
A. Yeah.
Q. And the mushroom powder, the undercover had solicited Mr. Roberts for mushrooms, is that correct?
A. Yes. I believe this came up within a conversation between the undercover and Mr. Roberts where mushrooms had previously been discussed. And the undercover requested to buy those.
Q. So Mr. Roberts gave the mushroom powder to the undercover, and actually didn't he say he didn't want money for it?
A. I believe so. I believe Mr. Roberts made a statement to that effect.
Q. He just wanted to gift it to him.
A. Yes.

Q. But the undercover threw down a $20 bill.
A. Yes.
Q. But Mr. Roberts didn’t want any money for it, is that correct?
A. Correct.
Q. And the THC being grown in the closet, is that what you said?
A. Yes.
Q. And THCA is different than THC because I Googled it. Have you done that?
A. Very little, yes. I am not as familiar with how that THCA is going to be regulated.
Q. As I understand it, THCA doesn’t cause a person to get, I guess will get high for lack of a better term, but THC does.
A. Okay.
Q. And if that’s true, what was in the closet was THCA.
A. Okay.
Q. Right? It was THCA in the closet?
A. That’s what will be tested by the labs. We won’t know that just yet.
Q. Okay. And once you had talked about with this Mr. Gilliam in Kansas City, Kansas, this -- there was a document, I think that was Exhibit #2. Did you ask Mr. Roberts if he had ever seen that Exhibit #2?
A. Yes. He had not.
Q. Thank you. And so, Mr. Gilliam, whatever he’s charged with

and whatever his affidavit says and whatever is going on in Kansas City, Kansas, is unrelated today, other than the information that's specifically the same thing as in Mr. Roberts' affidavit, is that correct?
A. I'm sorry. Can you repeat that?
Q. That was a long question. So, you did these two long affidavits, right? And some of them say, Subject 1, 2, and 3. But Subject 1 in the Kansas one, is that Mr. Roberts?
A. Yes.
Q. And it's the exact same language in Mr. Roberts' of what Mr. Roberts said?
A. Yes.
Q. So, the reason I'm asking you is this Signal app, I've never used it. But as I understand it, okay, it's encrypted first you said, correct?
A. I believe so.
Q. But after so many hours, does the stuff just disappear?
A. Some of those, yes. You can absolutely set a disappearing timer function. And that was something Mr. Roberts said that they used in the group chat.
Q. And so if someone was taking screenshots, let's say, those would be saved as pictures on someone's phone.
A. Uh-huh.
Q. But that doesn't mean that Mr. Roberts necessarily saw what everyone else was saying if he wasn't sitting by his phone during

time periods where they -- it might be pre-programmed to disappear, is that correct?
A. Yes.
Q. And the interaction with the neighbor that you described, it wasn't anything particularly nefarious. The guy said he was burning stuff in the back yard, is that correct?
A. Correct. Yes.
Q. And the way you ended it, I wasn't getting the exact sentence, so I'm paraphrasing. Didn't Mr. Roberts withdraw from this organization a week before he was charged, a week or two?
A. Yes. He withdrew from the group and deleted the app off his phone.
Q. And from your knowledge of the undercover, which I don't know, but was the undercover there at the end -- the undercover wanted him to make something specific, and it kind of -- it sounds like it spooked Mr. Roberts to just, I'm getting out of this organization?
A. I don't know. I don't know that the undercover asked Lake to make something. I don't believe that was the case. But I know that they discussed explosives extensively.
Q. Well, would it be fair to say that that rhetoric was sort of amping up there at the end?
A. From who?
Q. From someone in that chat group that made Mr. Roberts back off?

A. That's what I talked to Mr. Roberts about in the interview. That some of the things that were being discussed were not what he wanted to participate in because they were over the line. So, yes.

MS. NOURI: That's all I have, Your Honor. Thank you.

THE COURT: Mr. Alford, did you have something else?

MR. ALFORD: I do.

THE COURT: And also, did you want Exhibit #2 admitted?

MR. ALFORD: Yeah. I was going -- I was going to offer to admit Government Exhibit #2.

THE COURT: All right. Any objection to that, Ms. Nouri?

MS. NOURI: I have no objection, Your Honor.

THE COURT: All right. So, Government's Exhibit #2 will be admitted without objection.

REDIRECT EXAMINATION

BY MR. ALFORD:

Q. I just wanted to get an idea. Do you -- I know you said that the crushed mushrooms were grams. That was related to the controlled purchase, is that right?

A. Yes. The controlled purchase was a couple grams, I believe. The recovery at the residence, I do not know the amount in those, but my estimate -- there's 12 jars. And my estimate would be those consist of grams of that powder in an unknown amount.

Q. Okay. And we're still waiting on the labs to know whether or

not there is a controlled substance in those crushed mushrooms?
A. Correct. Yes.
Q. But is it fair to say that it’s your understanding that the active ingredient in psychedelic mushrooms is psilocin, which is a Schedule I controlled substance?
A. Yes, it is.
Q. And since counsel had asked you some questions regarding Mr. Gilliam and what was going on in Kansas, let me ask you this. When the defendant, Mr. Roberts, detonated these two destructive devices, was Mr. Gilliam present?
A. Yes, he was.
Q. So he was there?
A. Uh-huh. Yes.
Q. Is that fair?
A. Yes.
Q. And so that shows there’s a connection between the two of them?
A. Correct.

MR. ALFORD: No further questions.

THE COURT: Ms. Nouri?

MS. NOURI: Yes.

RECROSS EXAMINATION

BY MS. NOURI:
Q. And just to be clear, I think we all know there’s a connection because they were in that group that you said is

called Red Legs or something like that?
A. Correct.
Q. But since we've brought that up now, those two devices made by Mr. Roberts that were detonated were actually somewhere out of town in a rock quarry, like throw them down in a quarry with this Mr. Gilliam guy, --
A. Uh-huh.
Q. -- the undercover guy, and Mr. Roberts?
A. Correct.
Q. No one else was present?
A. No.
Q. And it wasn't by a neighborhood or anything like that? It was down in the bottom of a quarry?
A. Correct. There was a residence that was an unknown distance away, but the quarry is where I believe that they were.
Q. And correct me if I'm wrong because I really don't know the answer to this. Was that quarry the same place where Gilliam's grandma lived in the area and it was on her property?
A. Yes.
Q. So, they weren't just trespassing. It was a place that Gilliam knew there was quarry that they could --
A. Correct.
Q. -- detonate those items?
A. Yes.
Q. Thank you.

THE COURT: All right. Any other questions?

MR. ALFORD: No, thank you.

THE COURT: Okay. All right. Thank you. You can be seated. All right. Any other witnesses?

MR. ALFORD: No, Your Honor.

THE COURT: Okay. From you, Ms. Nouri, any witnesses?

MS. NOURI: No, Your Honor.

THE COURT: All right. So, let's go ahead and go to argument on this issue. You'll go first, Mr. Alford?

MR. ALFORD: Yes, Your Honor. This is not a rebuttable presumption case. Although, I will note that if the labs were to come back and the mushrooms in this case that were both in the controlled purchase as well as what was recovered at the defendant's residence, if that was, in fact, psilocin, we would have a charge that would be presumptive detention.

But having said that, I'll just deal with the main factors here, which are that the defendant poses an extreme risk to the community. One of the factors under the statute under the Bail Reform Act that the Court can consider is just the weight of the evidence. Here, you have, you know, compelling evidence of the defendant's guilt. He was with an undercover when he detonated these destructive devices. The remnants of those destructive devices have been recovered. And, you know, we have, you know, months of Signal chat communications from this defendant where he evinces his intent to sabotage infrastructures

owned by ICE. So, the evidence of his guilt is overwhelming. Moreover, when looking at just the nature of this offense, the possession of an unregistered destructive device that he actually detonated, that in itself is inherently dangerous. He could have killed himself when he lit it up. But also, when you look at the rhetoric of this particular defendant, which I won't belabor it, but it's shocking. It's absolutely shocking the things that this defendant was saying. He was talking about, you know, using drones to carry cocktails to demolish key structures such as frozen water areas, which is clearly he's referring to ICE. He's talking about we need to plan a decisive action against ICE and DHS. They're going to arrange to train with firearms specifically to deal with what they consider to be an upcoming civil war. And, you know, I'm not going to belabor it because I know the Court has read this, but this is absolutely a mirror or a window into the defendant's mind of where his mindset is. And his co-conspirators are worse. And that's one of the reasons why conspiracy in the United States is a crime because when two or more people agree to do something, it's more likely they're going to do it. And we have a case now in Kansas where one of his co-defendants, the one that went with him to detonate these destructive devices, he too had destructive devices that he's been charged with Kansas. And he also had these controlled substances they use as paralyzing agents with condoms. I mean, this is the kind of people that this defendant is hanging around.

Plus, this defendant had firearms. The World Cup journal. I can't tell you for certain what this is, but I know it's extremely concerning when you have, you know, on this page Security World Cup Roundtable. You have all of the dates of the World Cup matches. You have the Fan Fest, which is at the World War I Memorial. You're talking about like drones Cripl com systems. This is extremely, extremely concerning. You know, Maya Angelou, the famous writer and poet, she has a saying, she says, when somebody tells you who they are, you should believe them. That's exactly what the Signal chat in this defendant's communications of events. He has indicated he wants to have a civil war with the federal government. His colleagues are talking about kidnapping ICE agents and torturing them. The nature of the danger that this defendant poses the community is extreme. And so, we have to protect the community from him, particularly when the World Cup is right around the corner. These destructive devices could kill numerous of visitors to our city and he's evinced an interest in getting it. Now, when he found out he might have -- get caught, he decided to destroy evidence, which, by the way, that's something else that the Court could consider. If he were to be released, what other evidence is he going to destroy? The same day that he does the controlled purchase, he's seen like with a fire by his neighbor. Pretty good evidence he's going to destroy evidence if he can.

So, for all these reasons, we think that the Court

should detain the defendant pending the resolution of the case.

THE COURT: All right. Thank you. Ms. Nouri?

MS. NOURI: The information about this Jarred Gilliam, the inflammatory information, shouldn't even be considered by the Court. It sounds like it was a, like some date rape drug stuff and condoms. Like that has nothing to do with this case. But they were in the same organization. Gilliam was also present at the detonation at the quarry. But the other stuff that this guy was doing really should not have any bearing on whether or not you detain Mr. Roberts. The reality of it is, are there conditions that can be set. There's plenty of conditions that can be set and the community can remain safe.

First off, his parents are in the courtroom. They have agreed he can go straight from here to their residence. He has no reason to go back to that duplex. They don't have any weapons in their home. He takes classes online toward a degree from KU. Two classes in the summer. He's supposed to do full-time classes again in the fall like he did in the spring. If you're wondering why he's 25 or 26 and doesn't have his degree yet, the reality of it is he went through three years of a great depressive state before he started going to classes. He has a therapist that he had seen that got him back on the road. This person is ready to treat him immediately again. So, he can stay with his parents. He can be safe. You can set any condition. You can say he can never leave the home. Maybe he doesn't even go to school in the

fall. We just leave him sitting there and let this case play out.

Yeah. I'm disturbed too by Exhibit #2, but it doesn't have anything to do with my client. And so, yeah, that shocks the conscience. But it appears that Mr. Roberts just kind of got in over his head with this group and in the end is like I need to get out of this and got out. You know, you can put a home detention on him. You can do any kind of stuff like that with the parent supervision. They can be third-party custodians. They're going to be the first people that would call Pretrial and say something is not right. He's doing a mushroom or he's doing this. None of that is going to happen in their home, Your Honor. And, yeah, I get that mushrooms are a controlled substance. But we're not talking about heroin or, you know, some meth or whatever. It's mushrooms. Yeah, it's a controlled substance. It does not mix with what these people were doing. Maybe that's probably what was happening in the brain. The brain wasn't thinking very clearly, Your Honor.

So, I would ask you to set conditions knowing the public will be safe. You've read the Pretrial Report. You know everything about his parents. They have real jobs. You know, they -- the mother has offered everything to co-sign. They'll do whatever they can. They're just as embarrassed and appalled and all that as the rest of us that we're here today. But they're willing to take that responsibility and get Mr. Roberts the

treatment started again to help him mentally. So, I would ask you to consider sending him in their custody, Your Honor.

THE COURT: All right. Thank you. All right. So, Mr. Roberts, there are two aspects that the Court needs to look at as to whether a bond will be set or whether you will be in custody. Number one, would you be a flight risk. Would you abide by conditions that were set by the court. The Government would have to show that by a preponderance of the evidence. The other aspect is would you be a danger to the community. And the Government would have to show that by clear and convincing evidence. As both attorneys indicated, this is not a rebuttable presumption case where there is -- there is no presumption that detention is appropriate because of the nature of the charges in the Complaint and the penalties that go with it. So, we're not dealing with that. But the Court does look at various factors under 18 U.S.C. Section 3142(g). And those factors include the nature and circumstances of the offense, the weight of the evidence, your history and characteristics, and the nature and seriousness of the danger that would be posed to any person of the community that would be -- if you were to be released on bond. So, that's what I'm looking at here. I do note that in the Pretrial Report, you don't have any criminal history here. So, I think -- I think the real issue here is would you be -- would you be a danger to the community. So, that's what the Court is really going to focus on in making this decision here.

I think the challenge is the -- in looking at the affidavit and particularly some of the things that are attributed to you in that affidavit. I'll go back. It's page 5 of that affidavit that you had sent messages. And Mr. Alford had gone over some of those things. So, that is a real concern to the Court. On the other side, Ms. Nouri has indicated that you, I think from the testimony from the agent, too, that you had -- you withdrew from Red Leg -- Red Legs group just a week before you were arrested. So, I'm just trying to balance all of that out. The danger to the community is the key. That's the most important thing here. I'm going to take a brief recess and talk to Pretrial about a couple of things and then I will come back with a decision on this issue. So, give me about five or ten minutes. Thank you.

(Court in Recess from 2:24 p.m. until 2:31 p.m.)

THE COURT: All right. Please be seated. You ready? Okay. All right. We're back on the record. Thank you for allowing me some time to go over a few things in this matter.

Mr. Roberts, I had talked about what the Court was really looking at, and as I indicated, it is really the danger to the community aspect. So, in reviewing the -- what's in the affidavit and taking into consideration the arguments by both counsel, the Government and defense counsel, the Court is going to find that there are no condition or combination of conditions that would assure that the community would be safe if you were to be released. As I indicated, what's in the affidavit is very

troubling and a danger to the community. I don't think there are any conditions. I was thinking -- trying to think of conditions that would assure that the community could be safe if you were to be released with the nature of electronic -- use of electronics for communications. Even, I mean, GPS wouldn't be anything that would prevent other communications. Even if I said you couldn't use a computer, it's hard to monitor all that stuff. So, I think the only option that this Court has, the only decision that this Court could make, and it was shown by clear and convincing evidence that you would be a danger to the community if you were to be released. So, you will be detained while these charges are pending here in federal court. Okay. Anything else, Mr. Alford?

MR. ALFORD: No. Thank you, Your Honor.

THE COURT: Okay. Ms. Nouri, anything else??

MS. NOURI: Yes, Your Honor. I had talked with Government beforehand about Mr. Roberts has a condition that he is required to have a CPAP machine. There is some paperwork in front of you from St. Luke's Hospital. And he's been using this since 2018. His parents actually have his CPAP in the vehicle. When he entered Bates County where's being held and told the nurse this, and plus the inhaler that he needs with him, she said okay, but no follow-through yet. And they're not going to pay for a CPAP for this guy. It's very expensive. So, we have the CPAP. I'd like to deliver it to the Marshals on the Third Floor and that Bates County would transport it back with him. I know

from other clients that -- I've never done this before because I've never had anyone have a condition where they had to have it. He has not really slept since he's been in. And apparently his unit mates aren't happy with him because when he does fall asleep, he's snoring so bad. And so, you know, I want him to be safe. We all want that. And we all want him to be alert. So, I don't even know if Bates County allows it. I always hear judges say, well, you know, I'm going to defer to the Marshals. And the Marshals say, I'm deferring to the county. But if there's one county jail or if it's only Leavenworth, wherever he can use the CPAP, I really want the Court to strongly suggest this guy has to have his CPAP. It's legit.

THE COURT: Mr. Alford?

MR. ALFORD: Your Honor, I don't have any comment. Obviously, I would like, to the extent he can have a CPAP, I have to honestly defer to the Marshals about safety conditions. But I will tell the Court just anecdotally I had the same exact issue happen like 17 years ago. And back then there was a deputy marshal who was sort of the designee to deal with these kinds of requests. And ultimately, that detainee was able to get a CPAP. But I don't even -- I don't know if the Marshals still have a designated person for medical issues.

MS. NOURI: They do, Your Honor.

THE COURT: Okay.

MS. NOURI: And I spoke with them beforehand. I've been

told it's a U.S. Marshal Matthew Palmer. I'm going to go right to the Third Floor and discuss it with him. But I just want to grease the wheels now in case Bates County refuses. Then I'm going to have to turn around and pitch a fit and get him moved somewhere else if there's a county jail or Leavenworth. Otherwise, I'm going to ask for Springfield, which is like not --

THE COURT: Right.

MS. NOURI: It's financially a lot of money, but I just want to make sure he can function during this time period.

THE COURT: All right. And I think -- and thank you for that, Mr. Alford, also. Being familiar with CPAPs, I don't have one, but of people that use the CPAPs, how important that is, not only because they stop breathing and all that stuff. So, to that extent, unless there is some other reason not to, I'm going to order that after some -- whatever process the Marshals have to go through that -- order that Mr. Roberts does get that CPAP with him. I don't know about the asthma inhaler. I don't know about that.

MS. NOURI: I don't either. He prefers to have it on him. I have a lot of jails where they let the inmate hold it. I have some that don't. I think that's up to the facility. But if he's having an asthma attack, hopefully the corrections officers --

THE COURT: Right.

MS. NOURI: -- will get it and give it to him.

THE COURT: Okay. But I'll just -- I'll just --

MS. NOURI: That --

THE COURT: -- do the order on the CPAP.

MS. NOURI: That's going to be okay, I think. Yeah.

THE COURT: Okay. So, I'll just on the CPAP and hopefully -- the Marshals are pretty responsive to the medical needs of anyone who is detained. So, if there is any issue with that, you can get back with the Court, Ms. Nouri, and we'll address that and try to -- we want to make sure that he gets the medical equipment and things that he needs.

MS. NOURI: I appreciate that, Your Honor.

THE COURT: Okay. All right. Anything else?

MR. ALFORD: No, thank you, Your Honor.

THE COURT: All right. Ms. Nouri, anything else?

MS. NOURI: No, Your Honor.

THE COURT: All right. Thank you. We'll be in recess.

(Court Adjourned at 2:37 p.m.)

**INDEX**



| WITNESSES FOR THE PLAINTIFF: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Melissa McCain | 8 | 17 | 22 | 23 |

| EXHIBITS: | MARKED | ADMITTED |
|---|---|---|
| G#1 | 13 | 14 |
| G#2 | 15 | 22 |

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceeding in the above-entitled matter.

/s/ Lissa C. Whittaker June 29, 2026
Signature of transcriber Date